**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Security Life Insurance Company of America, a Minnesota corporation,

Plaintiff,

v.

Dean Stewart, an Oklahoma resident, James Dunham, a Louisiana resident, Charles Brooks, a Georgia resident, and Terry Eugene Elsner, a Georgia resident,

Defendants.

Civil No. 01-1677 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

---

Robert L. Meller, Jr. and Cynthia L. Hegarty, Best & Flanagan, Minneapolis, Minnesota, for Plaintiff.

Frederick E. Finch, Bassford, Lockhart, Truesdell & Briggs, Minneapolis, Minnesota, and Phillip P. Owens, II, and Chris Harper, Harper Law Offices, Oklahoma City, Oklahoma, for Defendants Dean Stewart and James Dunham.

Paul A. Sortland, Sortland Law Offices, Minneapolis, Minnesota, for Defendants Charles Brooks and Terry Eugene Elsner.

---

## Introduction

Plaintiff Security Life Insurance Company of America ("Security Life"), a Minnesota-based company, brought a diversity action in this Court alleging that four non-resident insurance agents breached their contracts with Security Life, or have been unjustly enriched, because they have failed to repay commissions advanced to them in



AUG 09 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

connection with thousands of policies that lapsed due to the non-payment of premiums. In response, two of the agents, Stewart and Dunham, asserted counterclaims against Security Life and crossclaims against the other two defendants, Brooks and Elsner. Before the Court is Security Life's Motion for Summary Judgment. It seeks summary judgment on the issue of liability and damages for defendants' breaches of contract or, in the alternative, partial summary judgment on the issue of liability alone. It also moves for summary judgment on Stewart and Dunham's counterclaims. For the reasons set forth below, the Motion will be granted in part.

**Background**

Plaintiff Security Life sells insurance products, including life insurance, in several states. In May 1995, Dean Stewart, an Oklahoma resident and licensed insurance agent appointed by Security Life to sell its insurance products, signed a Managing Producer Contract with Security Life. (Grotta Aff. Ex. A.) That contract granted Stewart the authority to "organize, train, and maintain a sufficient agency force;" the contract refers to these sub-agents of Stewart as "producers." (Id.) Stewart and three of his sub-agents or producers–Dunham, Brooks, and Elsner–are the defendants in this lawsuit. The defendants are listed in order of their hierarchy, based on which producers appointed which subagents: Stewart appointed Dunham; Dunham appointed Brooks; and Brooks appointed Elsner, who appointed several subagents who are not parties to this litigation.

When each of the defendants began working for Security Life, they entered into at

least two agreements, a Managing Producer Contract or an Agent Agreement and an Agreement for Advance Commissions. Under these contracts, the defendants received commissions advanced to them for policies sold by them or their sub-agents. Generally, Security Life advances to its agents nine months' commission at the time a life insurance policy is procured by an agent. (Mathiason Aff. ¶ 2.) This advance shows as a debit on the agent's monthly commission statement, and it is subsequently reduced on the statement as the company receives monthly premiums from the insureds. (Id.)

Before July 1, 2000, Security Life used the following procedure if a policy was canceled within nine months for nonpayment and an advanced commission had been paid. Security Life would recoup the unearned advance commissions from the agents on a pro rata basis, known as a "charge back." (Id.) Thus, if a policy was canceled after five months, Security Life would charge back four months' commissions to the agents. After July 1, 2000, Security Life changed its charge back procedure. If a policy was canceled during the first six months after the issue date, 100% of the commission advanced to the agent became due and owing and thus, charged back against the agent's account balance, and if a policy was canceled between the seventh and ninth months, then any pro-rata unearned commissions advanced to the agent were charged back against the agent's account. (Id. ¶ 3.) If the agent did not have an account balance which could be used to off-set the charge back, then the agent owed a general debt to Security Life. (Id.)

Effective July 1, 2000, Security Life implemented changes to its charge back

policy by sending written notices to Stewart and Dunham on May 23, 2000. (Id. ¶ 8.) It notified Brooks and Elsner on May 24 and 25, 2000, by sending a notice of the changes and the new policy with each agent's advance commission statement. Later, Dunham requested additional changes be made to the commission schedule for his sub-agents, Brooks and Elsner, and they were informed of these changes in writing. (Id.) Each of thc defendants' contracts with Security Life provided that the company could change its policies and procedures. (Hegarty Aff. Ex. A-D.)

At issue in this matter are advance commissions paid for policies sold by Elsner. Security Life alleges that, from early 1999 through the spring of 2001, Elsner procured 4,092 policies which Security Life issued to a Georgia business entity called the Twin Oaks Foundation. (Mathiason Aff. ¶ 4.) It also alleges that, through the hierarchical system described above, all of the defendants received commissions from Elsner's sale of policies to the Twin Oaks Foundation. (Id.) Of those policies, however, 3,591 policies (the "Twin Oak policies") were cancelled for nonpayment of premiums within nine months after the policies were taken out.[1] (Id.) When these policies were canceled,

---

[1]There is a dispute over whether all of these policies should have been canceled. At some point, the Twin Oaks Foundation made a partial payment of $125,000 to Security Life for premium payments for half of its policies. Security Life did not apply the payment to the policies and instead put the money into an escrow account. Defendants maintain that if this amount had been applied, many of the policies would have been paid for nine months or at least six months and had the policies later lapsed, only a pro-rata share would have been due, instead of 100% of the commissions advanced.

Security Life took charge backs against Elsner's unearned commissions that had been advanced to him. (Id. ¶ 6.) Those charge backs plus Elsner's existing debit balance, resulting from the receipt of other advanced commissions, total approximately $853,000 as of June 2001. (Id.) Security Life terminated its relationship with Elsner and demanded that he repay the $853,000. (Id. ¶ 5.) Elsncr has refused to do so. (Id.) Security Life has also terminated its relationships with Brooks and Dunham, and they have refused to repay any debt, as has Stewart. (Id.) Security Life alleges that it is owed the following: Elsner is liable for approximately $853,000; Brooks is liable for Elsner's debt plus unearned commissions paid to him on the Twin Oaks policies for a total of approximately $958,0000; Dunham is liable for Elsner's and Brooks' debt plus unearned commissions paid to him on the Twin Oaks policies for a total of approximately $1,013,000; and Stewart is liable for Elsner's, Brooks', and Dunham's debt plus unearned commissions paid to him on the Twin Oaks policies for a total of approximately $1,061,000. (Id. ¶¶ 6-7.)

On September 12, 2001, Security Life commenced this suit against the four defendants, alleging breach of contract and unjust enrichment. An Amended Complaint was filed on November 18, 2001, alleging the same two causes of action. In their Answers to the Amended Complaint, Stewart and Dunham filed counterclaims against Security Life, alleging breach of fiduciary duty and improper setoffs, and crossclaims against Brooks and Elsner, seeking indemnity and contribution and alleging intentional

interference with their contracts and business relationships. Security Life has moved for summary judgment against all four defendants for liability and damages for breaches of their agent agreements, or in the alternative, for partial summary judgment on the issue of liability alone. In addition, Security Life moved for summary judgment of Stewart and Dunham's counterclaims.

## Analysis

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

> If the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 595 (8th Cir. 2001) (quoting Celotex, 477 U.S. at 323 (1986)).

The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## I. Defendants' Personal Liability

Security Life contends that each of the defendants agreed to be held personally liable for the advance commissions paid for the Twin Oaks policies. Each defendant's liability will be discussed separately, beginning with Elsner's because he was the agent who procured the Twin Oaks policies.

### A. Elsner

On January 25, 1999, Elsner executed an Agent Agreement. Under the paragraph entitled "Indebtedness," the Agent Agreement provides:

> You are responsible for the payment to the Company of all monies

> which . . . . are due the Company because of compensation paid to You or Your subagents upon refund, return or non-collection . . . Any indebtedness to the Company or associated agency incurred by you shall be a first lien on any monies due or to become due under this Agreement. The Company may, at any time, deduct any such indebtedness from any monies due You, and at the Company's option any collection costs.
>
> You hereby irrevocably assign to the Company any and all commissions or other income due or to become due You from any source whatsoever to be paid to and applied by the Company, in payment or partial payment of any indebtedness that may be owed by you or your sub-agents. You hereby direct and authorize any person or company with whom You may heretofore or hereafter contract to pay any such sums under this assignment upon demand to the Company. . . .

(Hegarty Aff. Ex. D (emphasis added).) The Agent Agreement also provides that Security Life could change the commission rates at any time, provided that it gave written notice to Elsner. (Id. Ex D at Commissions.)

Elsner also executed an Application and Agreement for Advance Commissions on January 25, 1999. That agreement provides:

> 1. All sums advanced to me and/or to my subproducers by the Company shall constitute an indebtedness of mine to the Company. I agree on behalf of myself, my heirs, successors, and assigns, to pay to the Company, or its affiliates or assigns, or to their order, the outstanding balance of such sums advanced to me and/or to my subproducers which shall be due and payable at any time upon demand and shall be immediately payable concurrent with the effective date of termination of my Contract.
>
> 2. All earned commissions coming due under my Agent Agreement are assigned to the Company as security for the sums advanced hereunder and such earned commissions shall be applied to the

> repayment of the indebtedness created by such advances; provided, however, that this assignment of earned commissions shall not relieve me of the obligation to repay all outstanding indebtedness pursuant to Paragraph 1 hereof.

(Id. Ex. H (emphasis added).) The Agreement for Advanced Commissions also states that Security Life could change the company's practice with respect to advanced commissions at any time, provided that Security Life notified Dunham in writing. (Id. Ex. H ¶ 4.)

When the Twin Oaks policies were canceled, charge backs were taken against Elsner's unearned commissions that had been advanced to him. When Elsner was subsequently terminated, those charge backs, together with his existing debit balance, totaled approximately $853,000. Security Life contends that Elsner is personally liable for this amount because he agreed to be so when he executed the Agent Agreement and the Agreement on Advance Commissions. In response, Elsner claims that that he did not agree to be personally liable for the advances; rather he states that the contracts he signed created nothing more than indebtedness, not personal liability. To date, he has refused to repay the money advanced to him.

The general rule is that advances on commissions cannot be recovered after termination of a relationship unless there is a clear promise to pay.[2] Hubley v. Cram, 404

---

[2]The Dunham and Elsner Agent Agreements contain a choice-of-law provision that the Agreement "shall be construed in accordance with the laws of Minnesota." (Hegarty Aff. E's. B & D.) The Stewart and Brooks Managing Producer Contracts do not contain a similar provision and neither do the four Agreements for Advance Commissions. To construe the contracts at issue, Stewart and Dunham cite to Oklahoma law, and Brooks

N.W.2d 389, 390 (Minn. Ct. App. 1987). "The rationale for this rule is that advances are generally in the nature of salary, and not a loan to the employee." Id. (internal quotations omitted).

In Hubley, the defendant was employed as an insurance agent and entered into a "Special Agent Contract," which contained a section entitled "Indebtedness." Id. at 389. That section provided that any indebtedness of the agent "shall be a first lien upon any compensation or amounts payable under this or any previous contract." Id. at 390. The Special Agent Contract also provided that "[t]ermination shall not relieve Agent or his estate of any indebtedness or other liability to the Company or General Agent arising hereunder." Id. (emphasis added). The Minnesota Court of Appeals reviewed the contract and noted that the "arising hereunder" language referred only to the indebtedness, which was in the form of a lien on "any compensation or amounts payable" under the contract. Id. Thus, the court determined from the foregoing language that the contract did not create any personal indebtedness. Id. In doing so, it noted that "[t]he contract could have contained language permitting respondents to recover overdrafts by

---

and Elsner cite to Georgia law. Before turning to a choice-of-law analysis, however, a court must first determine if a true conflict exists. American Cas. Co. of Reading, PA v. Bank of Montana Sys., 675 F. Supp. 538 (D. Minn. 1987) (MacLaughlin, J.). Both Oklahoma and Georgia follow the general rule that advances on commissions cannot be recovered after termination of a relationship unless there is a clear promise to pay. See e.g., Biggers v. Ward, 106 P.2d 791, 791 (Okla. 1940); Armstrong v. Security Life & Trust Co., 132 S.E.2d 798, 799 (Ga. Ct. App. 1963). Therefore, no choice-of-law analysis needs to be performed, and the analysis regarding the general rule under Minnesota law will be applied to the remaining defendants' contracts.

means of promissory notes" and that "[t]he contract could also have provided that appellant would be personally liable for any overdrafts." Id. (emphasis added). The court concluded by stating "without explicit language giving appellant notice of his personal liability, we must follow the general rule that agents are not liable for the excess of advances over commissions." Id.

Hubley has been followed by another Minnesota Court of Appeals decision, Entertainment Designs, Inc. v. Leja, 1991 WL 119536 (Minn. Ct. App. July 9, 1991). In that case, the defendant was hired as a sales manager and under his contract was able to draw additional compensation against future sales commissions. Entertainment Designs, 1991 WL 119536 at *1. The contract provided that "[i]n the event that the employment relationship between the Employee and the Corporation is terminated . . . the Employee shall return the excess to the Corporation within thirty (30) days of the date of termination." Id. Based on this language, the court stated, "[u]nlike the contract involved in Hubley, which failed to specify a repayment obligation, this provision unambiguously required [the defendant] to repay the excess draws." Id. The court then affirmed the trial court's award of partial summary judgment in favor of the plaintiff, who was seeking to collect the outstanding debt owed by the defendant. Id.

The issue before the Court, then, is whether the language in the Elsner contracts trumps the general rule that agents are not liable for the excess of advances over commissions. At oral argument, the Court invited the parties to submit supplemental

briefs in response to the Court's inquiry regarding Entertainment Designs. The parties submitted supplemental briefs, which the Court has considered. All of the defendants argue that the language at issue in the agreements here is more akin to the contract in Hubley, than to the contract in Entertainment Designs. In addition, they point out that Entertainment Designs is an unpublished decision and therefore cannot be cited as precedent. The Minnesota Court of Appeals has reminded district courts that "unpublished opinions of the Court of Appeals are not precedential" and that "[a]t best, these opinions can be of persuasive value." Dynamic Air v. Bloch, 502 N.W.2d 796, 800-01 (Minn. Ct. App. 1993). The Court views Entertainment Designs as persuasive because it gives an example of the type of contract the Hubley court was describing when it said that the contract "could have" provided for personal liability. It certainly is not at odds with the principles established in Hubley.

By signing the Agreement for Advance Commissions, Elsner agreed to be personally liable for all commissions advanced to him. The language contained in the agreement clearly contemplates personal indebtedness. It states that "all sums advanced . . . shall constitute an indebtedness of mine . . . which shall be . . . immediately payable concurrent with the effective date of termination of my Contract." Thus, it expressly requires repayment of the debt upon termination of employment. See e.g., Passiatore v. Hartford Life & Accident Co., 394 So. 2d 1132, 1132 (Fla. Dist. Ct. App. 1981) (concluding that an agreement, which provided that "on termination of this

agreement all outstanding advances shall become due and repayable," imposed personal liability). In addition, the Agreement for Advance Commissions provides that Elsner agrees on behalf of himself, his heirs, successors, and assigns to pay the debt and that the assignment of future commissions does not relieve Elsner of the obligation to repay the debt. Thus, it binds Elsner to pay the debt, regardless of whether there is a lien on his future commissions. Finally, it should be noted that this situation is different from Hubley and the other cases cited by defendants because in those cases, a defendant entered into contract concerning his or her personal salary. In this case, not only did the defendants agree to be liable for their own advances, they agreed to be liable for advances made to their subagents. For this reason, the case at hand is distinguishable from the cases cited to the Court. The Court concludes that Elsner agreed to be held personally liable for commissions advanced to him and that therefore, he is liable for advances made to him from the Twin Oaks policies.

**B. Brooks**

On March 1, 1997, Brooks executed a Managing Producer Contract with Security Life, which provides that as a managing producer, Brooks:

> shall be responsible to the Company for all loss or damage arising from business done by or entrusted to producers, employees, or others appointed, employed or recognized as such by him or her and shall identify and hold the Company harmless from any and all expenses, costs, causes of action, loss or damages resulting from fraudulent or unauthorized acts or omissions of himself or any other of such persons with respect to such business.

(Hegarty Aff. Ex. C ¶ 5 (emphasis added).) The contract also states that:

> The Company shall have a first lien on all commissions and bonuses payable under this agreement and any supplement also attached to this agreement for any debt due the Company from the Managing Producer or his or her Producers. The Company may at any time deduct from any monies due the Managing Producer under this contract or from any other source, any debt or debts due the Company, from the Managing Producer, or his or her Producers together with interest at the legal rate.
>
> The Managing Producer further agrees that he or she will pay any indebtedness of any of his or her agents to the Company which they do not pay within a reasonable time after termination of such Producers. The Managing Producer also agrees that he or she will pay the loss, as determined by the Company and shall have a first lien to the extent of such losses against any monies payable hereunder.

(Id. Ex. C ¶ 13 (emphasis added).) The Managing Producer Contract also allows Security Life to change its commission schedule, without express written consent of Brooks after he received notice of the amendment in the mail. (Id. Ex. C ¶ 6.) At the time Brooks entered into the Managing Producer Contract, he also executed an Application and Agreement for Advance Commissions, which is identical to the one quoted above that Elsner signed. (See id. Ex. G.)

When Brooks executed the Managing Producer Contract and the Agreement on Advance Commissions, he agreed to be held personally liable for his own debts and the debts of his subproducers, in this case, Elsner's debts. The discussion regarding Elsner's personal liability applies with equal force to Brooks' obligations. Moreover, even without

the language in the Agreement on Advance Commissions, Brooks agreed to be held personally liable in the Managing Producer Contract, which provides that Brooks agrees to "pay any indebtedness of any of his . . . agents to the Company which they do not pay within a reasonable time after termination of such Producers." This language gives Brooks notice that he is personally liable and is distinguishable from the language in Hubley. The Court concludes that Brooks agreed to be held personally liable for commissions advanced to him and to his subagents; therefore, he is liable for advances made to him and to Elsner from the Twin Oaks policies.

**C. Dunham**

Dunham executed an Application and Agreement for Advance Commissions on April 4, 1997, which is identical to the agreement that Elsner entered into on January 25, 1999. (See Hegarty Aff. Ex. F.) Later, on March 26, 1998, Dunham executed an Agent Agreement, which superceded any other agreement between Security Life and Dunham.[3] That Agent Agreement is identical to the Agent Agreement signed by Elsner and quoted above. (See id. Ex. B.)

Dunham, together with Stewart, argues that he cannot be held personally liable for Elsner's and Brooks' actions because they acted outside the scope of their agency. (Stewart and Dunham's Mem. in Opp. to Summ. J. at 5.) This argument is without merit,

---

[3]Dunham had previously signed a Managing Producer Contract dated April 1, 1997.

however, because Security Life asserts no claim based on the principles of agency law that Elsner or Brooks acted outside of their agency; instead, Security Life is simply seeking repayment of commissions based on contractual agreements to repay sums received. The scope of agency argument is better suited as an argument in support of Dunham's and Stewart's crossclaims.[4]

Based on the analysis of Elsner's agreements discussed above, the Court concludes that Dunham agreed to be held personally liable for commissions advanced to him and to his subagents; therefore, he is liable for advances made to him, Brooks, and Elsner from the Twin Oaks policies.

### D. Stewart

On May 1, 1995, Stewart signed a Managing Producer Contract with Security Life, which was identical to Brooks' Managing Producer Contract, which is quoted above. (See Grotta Aff. Ex. A.). On that same date, Stewart also signed an Agreement of Advance Commissions, which is substantially similar to the agreements quoted above. (See Hegarty Aff. Ex. E.) The Agreement for Advance Commissions Stewart signed, however, differs in one material respect from the other defendants' Agreements for Advance Commissions. Stewart's agreement provides:

---

[4]Moreover, this argument may support Security Life's unjust enrichment claim. Stewart and Dunham received commissions from the Twin Oaks policies; however, they argue that Brooks and Elsner exceeded the scope of their agencies. If Brooks and Elsner acted outside the scope of their agencies, then Stewart and Dunham should not have received any commissions from those acts.

> 1. All sums advanced to me by the Company shall constitute an indebtedness of mine to the Company, the outstanding balance of which shall be due and payable at any time upon demand and shall be immediately payable concurrent with the effective date of termination of my Producer's Contract.

(Id. (emphasis added).)

Although Stewart did not agree to be liable for the debts of his subagents in his Agreement for Advance Commissions, he nonetheless agreed to be personally liable for his and his subagents debts when he signed the Managing Producer Contract. As is the case with the same contract signed by Brooks, Stewart agreed to be held personally liable when he agreed to "pay any indebtedness of any of his . . . agents to the Company which they do not pay within a reasonable time after termination of such Producers." This language gives Brooks notice that he is agreeing to be personally liable for his debts and his subagents' debts. See e.g., Passiatore, 394 So. 2d at1132. The Court concludes that Stewart agreed to be held personally liable for commissions advanced to him and to his subagents; therefore, he is liable for advances made to him and to Dunham, Brooks and Elsner from the Twin Oaks policies.

## II. Counterclaims for Breach of Fiduciary Duty

In their answers to the Amended Complaint, Stewart and Dunham asserted separate, although nearly identical, counterclaims against Security Life, alleging breach of fiduciary duty. Specifically, they allege that "as a result of a contractual agreement," Security Life owed them a fiduciary duty and that it breached that duty by "accepting the

insurance contracts at issue." (Stewart Countercl. ¶¶ 1-2, Dunham Countercl. ¶¶ 1-2.) Security Life has moved for summary judgment on both counterclaims. Security Life contends that Stewart and Dunham have failed to established the requisite elements for their claims. In response, Stewart and Dunham cite two cases for the general proposition of what constitutes a fiduciary relationship. (Id. (citing Kennedy, 143 N.W.2d at 830 and Lowrance v. Patton, 710 P.2d 108, 112 (Okla. 1985).) [5] Neither case involved a relationship between an insurer and an agent.

Under Minnesota law, "[a] fiduciary relationship exists when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal." Kennedy v. Flo-Tronics, Inc., 143 N.W.2d 827, 830 (Minn. 1966). The existence of a fiduciary relationship giving rise to a fiduciary duty is a question of fact. Burgmeier v. Farm Credit Bank, 499 N.W.2d 43, 51 (Minn. Ct. App. 1993).

Stewart and Dunham have failed to offer any evidence to show that their relationship with Security Life was anything more than an arm's length transaction

---

[5] Under Oklahoma law, "[a] fiduciary relationship springs from an attitude of trust and confidence and is based on some form of agreement, either expressed or implied, from which it can be said the minds have been met to create a mutual obligation." Lowrance, 710 P.2d at 112. The existence of a fiduciary relationship is a question of fact, dependent on the factual circumstances surrounding the parties' relationship and transactions, which must be proven by the party asserting the relationship. See Vinita v. Kissee, 859 P.2d 502, 510-11 (Okla. 1993). For the purposes of this motion, Stewart and Dunham concede the similarity of Minnesota and Oklahoma law. (Stewart and Dunham's Mem. in Opp'n of Summ. J. at 4.)

between an insurance company and an independent contractor. Instead, they state that "it is undisputed that plaintiff had a duty to conduct a due diligence investigation of Elsner, Brooks and the Twins Oaks Foundation" and that "it is undisputed that plaintiff did not timely conduct such an investigation." (Stewart and Dunham's Mem. at 7.) Even if Security Life had an "undisputed" duty to investigate, they nonetheless fail to show how that duty gave rise to a fiduciary duty. To establish that a fiduciary duty existed, Stewart and Dunham needed to show that a fiduciary relationship existed. That is, they needed to show that they reposed confidence in Security Life and as a result, Security Life had influence over them. They have failed to do so. In fact, the record demonstrates that if anyone had a duty, Stewart did. He agreed to "organize, train, and maintain a sufficient agency force" and to be "responsible to the Company for all loss or damage arising from business done by or entrusted to producers." (Grotta Aff. Ex. A at Appointment of Agents.) Viewing the evidence in the light most favorable to Stewart and Dunham, they have failed to demonstrate the existence of specific facts that create a genuine issue of whether Security Life owed a fiduciary duty, much less whether Security Life breached that duty. Accordingly, Security Life is entitled to summary judgment on these counterclaims.

**III. Counterclaims for Improper Setoffs**

As explained at oral argument, the Court will address the issues of damages at a later date. Closely tied to the issue of damages is Stewart's and Dunham's counterclaims

alleging improper setoffs. Although the counterclaims are separate, they are nearly identical.

Stewart alleges that Security Life "improperly setoff a sum in excess of $40,000.00 owed to him" by Security Life, and Dunham alleges that Security Life "improperly setoff certain sums owed to him" by Security Life. (Stewart Countercl. ¶ 3, Dunham Countercl. ¶ 3.) They both claim that these amounts were improperly setoff against the debit balances Security Life "improperly claimed to be owed" by them. (Id.) They base their claims on (1) their assertion that they never agreed to the change in charge back procedures and (2) Security Life never properly credited the $125,000 premium payment made by the Twin Oaks Foundation to policies before they lapsed. (Stewart and Dunham's Mem. in Opp'n to Summ. J. at 12.) According to Stewart and Dunham, if Security Life would have applied the $125,000 to some of the policies, many of the policies would have been paid for nine months or at least, six months. If so, many of the policies would not have lapsed within nine months or when the policies lapsed, only a pro-rata share should have been due.

Relying on the language of the agreements signed by Stewart and Dunham, Security Life moved for summary judgment, contending that it had a right to amend the charge back procedures. It failed to explain, however, why the $125,000 in escrow should not be attributed to the Twin Oak policies and to demonstrate that it has properly charged back amounts against Stewart's and Dunham's accounts. Accordingly, at this

stage, genuine issues of material fact exist concerning Stewart's and Dunham's improper setoffs counterclaims. Summary judgment is therefore denied.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED THAT** Plaintiff's Motion for Summary Judgment (Doc. No. 33) is **GRANTED IN PART**;

1. Plaintiff's motion for partial summary judgment on the issue of liability alone is **GRANTED**;
2. Plaintiff's motion for summary judgment on Defendant Stewart's and Defendant Dunham's breach of fiduciary duty counterclaims is **GRANTED**. Defendant Stewart's and Defendant Dunham's breach of fiduciary duty counterclaims are **DISMISSED WITH PREJUDICE**;
3. Plaintiff's motion for summary judgment on Defendant Stewart's and Defendant Dunham's improper setoffs counterclaims is **DENIED**.[6]

Dated: August 9, 2002

RICHARD H. KYLE
United States District Judge

---

[6]Issues remaining for the trial scheduled for September 2002 are (1) Plaintiffs' claim for damages, (2) Stewart's and Dunham's counterclaims for improper setoffs, and (3) Stewart's and Dunham's crossclaims against Brooks and Elsner.